**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PENGFEI CHI** | : | |
| | : | |
| **Petitioner,** | : | **3:26-cv-1805** |
| | : | **(JUDGE MARIANI)** |
| **v.** | : | |
| | : | |
| **CRAIG LOWE, WARDEN, PIKE COUNTY CORRECTIONAL FACILITY, *et al.*,** | : | |
| | : | |
| **Respondents.** | : | |

**MEMORANDUM OPINION**

## I. BACKGROUND

Petitioner Pengfei Chi ("Petitioner"), a citizen of China who entered the United States in 2018 and overstayed his visa, filed a counseled amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. (Doc. 15). Petitioner is detained within the Middle District of Pennsylvania and names as Respondents Craig Lowe, Warden of the Pike County Correctional Facility, Todd Blanche, Acting Attorney General, Markwayne Mullin, Secretary of DHS, David Venturella, Acting Director of ICE, Michael Rose, Philadelphia ICE Field Office Director. (*Id.*, ¶¶ 19-24).

Petitioner lawfully entered the United States at JFK Airport "as a B-2 visitor, with authorization to remain until August 17, 2018." (*Id.*, ¶ 37). In December 2018 Petitioner filed an Application for Asylum that "remained pending for years without an asylum interview or final adjudication." (*Id.*, ¶ 38). Petitioner alleges he "has substantial ties to the United

States," including a wife and son who reside in the United States. (*Id.*, ¶ 40). He further alleges "[h]e has owned property in Orange County, New York, has maintained employment authorization, has worked in the United States, and has no criminal history." (*Id.*).

On February 4, 2026, Petitioner was arrested by ICE and served with a Notice to Appear charging him as removable pursuant to 8 U.S.C. § 1227(a)(2)(iii) of the Immigration and Nationality Act ("INA") for overstaying his visa. (*Id.*, ¶ 41). "After his arrest, Petitioner sought custody redetermination three times." (*Id.*, ¶ 42). The first two bond hearings were held by Immigration Judge ("IJ") Shana Chen and Petitioner was represented by his attorney Athena Bu. First, on March 3, 2026, IJ Chen denied release "because Petitioner had not provided sufficient objective evidence of stable residence." (*Id.*). Second, on March 17, 2026, "a further request was denied because Petitioner had already received a custody hearing and allegedly had not shown changed circumstances." (*Id.*). Petitioner then terminated his attorney-client relationship with Ms. Bu. (Doc. 1-7 at 19). On April 16, 2026, Petitioner hired new immigration counsel, Ms. Zhou Mei. (*Id.*). Petitioner, through new counsel, submitted a third request for custody redetermination, but on May 12, 2026, that "request was denied on the ground that new evidence that could have been filed previously did not constitute changed circumstances." (Doc. 15, ¶ 42).

On May 14, 2026, IJ Corey Combs held a Merits Hearing and ordered Petitioner removed to China. (*Id.*, ¶ 6). As reflected in his Order:

> The respondent has two asylum applications in the eROP. The first application was filed on 3/16/2026 by the respondent's former attorney, Athena Bu. The second,

updated asylum application was filed on 5/6/2026 by the respondent's current attorney, Mei Zhou. The respondent was unable to say if he had reviewed the updated application with his attorney or not. The court clarified that it is the respondent's signature on the updated application.

When asked by the court if the application was reviewed with the respondent, counsel for the respondent first said that the respondent's child was going to review it with him. Counsel then told the court that the only update was to the address history, and she reviewed that with the respondent.

The court realized that in the initial asylum application, 4 questions were answered only with "Please see personal statement and supporting documents." These are the questions about past harm, fear of future harm, detentions, and belonging to any organizations. The Court noted to counsel that the updates in the new application were substantive and not just address history, and asked how these answers were obtained if the application was not reviewed with the respondent.

Counsel informed the court that the answers were taken from his written personal statements, submitted 3/16/2016 [sic]. The court asked counsel if these were direct copy and pasted sections, to which counsel told the court they pretty much were. The court, upon review of the personal statement, determined that none of the updated answers were direct copies from the personal statement. When the court asked counsel about this, the court was informed by counsel that counsel used the respondent's personal statement to answer the questions.

The court confirmed that the respondent was not read the questions and did not provide the answers on his updated asylum application. The court fails to understand why counsel would write answers on behalf of her client and never discuss the questions or answers with him.

The court cannot consider this a completed asylum application. This application was never gone over with the respondent, the questions were never read to him, and it contained material, in-depth answers that were not written by the respondent directly, or even with his consultation.

The court must also consider the asylum application incomplete given these deficiencies and cannot accept it and consider it today. The court further notes that the initial asylum application was also not complete due to the aforementioned answered solely "Please see personal statement and supporting documents."

> For these reasons, the court does not have a complete application to consider today, and therefore the respondent must be ordered removed.

(Doc. 1-7 at 23-24). IJ Combs also referred Petitioner's second immigration counsel, Ms. Zhou, to the Disciplinary Counsel for the Executive Office of Immigration Review ("EOIR"). (*Id.* at 25-27). Ms. Zhou is alleged to have violated several of EOIR's rules of professional misconduct, including 8 C.F.R. §§ 1003.102(c) (false statement of material fact), 1003.102.(k) (ineffective assistance of counsel), 1003.102(n) (conduct prejudicial to the administration of justice), 1003.102(o) (competence), and 1003.102(q) (diligence). (*Id.* at 26).

On June 22, 2026, Petitioner filed a motion to re-open through new immigration counsel, Mike Gao. (Doc. 1-7). He filed his initial habeas petition with this Court on June 30, 2026, through habeas counsel. (Doc. 1).

On July 13, 2026, after the completion of the habeas briefing, the Court was informed by habeas counsel that an IJ "granted Petitioner's timely motion to reopen, expressly finding that Petitioner had sufficiently demonstrated that reopening was warranted because of ineffective assistance of counsel." (*Id.*). The Court then directed Petitioner to file an amended petition, set a new briefing schedule, and ordered Petitioner to file the transcripts of the bond hearings he alleges were fundamentally unfair. (Docs. 14, 18). As a result of the reopening of his removal proceedings, Petitioner does not have a final order of removal and Respondents are detaining him pursuant to 8 U.S.C. § 1226(a).

Petitioner "seeks habeas relief because Respondents continue to detain him under 8 U.S.C. § 1226(a) despite his lawful admission history, lack of criminal record, long-pending asylum application, materially unreliable custody records, and three custody proceedings that failed to provide meaningful individualized review." (*Id.*, ¶ 1). He claims that his detention under 8 U.S.C. § 1226(a) violates the INA because it "does not authorize continued custody based on materially unreliable records and a custody process that fails to provide meaning individualized consideration of whether detention is necessary." (*Id.*, ¶ 52). Petitioner further claims his detention violates due process because his bond proceedings "did not provide meaningful individualized review of Petitioner's actual circumstances, including his lawful admission, long-pending asylum application, family and community ties, employment history, property ownership, lack of criminal history, and availability of conditions less restrictive than detention."[1] (*Id.*, ¶ 58). He seeks his immediate release from custody or a "prompt custody redetermination at which Respondents bear the burden of proving by clear and convincing evidence that continued detention is necessary." (*Id.*, ¶ 72).

---

1 Petitioner further alleges that "[t]he custody records also contained numerous factual errors and internal inconsistencies" that "undermine any claim that Petitioner's continued detention rests on a reliable, individual assessment." (Doc. 15, ¶ 5). These alleged errors include: "that Petitioner boarded in Taiwan, was unemployed or retired, was unmarried and had no children, and had filed an EAD application in May 2017—even though Petitioner had not yet entered the United States at that time." (*Id.*). Moreover, the "Notice to Appear charged Petitioner as an admitted B-2 overstay while also including language suggesting that the notice followed a credible-fear finding and vacatur of a § 235(b)(1) expedited-removal order." (*Id.*).

Respondents oppose the petition, claiming that Petitioner's detention "does not offend due process because the Attorney General of the United States may detain noncitizens during determination of their removal status" and Petitioner "can administratively contest his detention." (Doc. 16 at 4). Respondents further claim that because Petitioner "is in pre-removal detention, decisions concerning his ongoing detention are at the discretion of the immigration judge." (*Id.* at 5).

## II. STANDARD OF REVIEW

Absent suspension, the Constitution guarantees the availability of the writ of habeas corpus "to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const., Art I, § 9, cl. 2). Pursuant to 28 U.S.C. § 2241, a federal district court may grant a habeas petition where a petitioner's immigration detention is "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Historically, "the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). Claims brought by immigration detainees seeking relief from their confinement "fall within the core of the writ of habeas corpus." *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025). It is well established that a federal habeas corpus petitioner generally has the burden of proving facts entitling him to a discharge from custody. *Goins v. Brierley*, 464 F.2d 947, 949 (3d Cir. 1972) (citations omitted).

## III. ANALYSIS

Petitioner seeks his immediate release or another bond hearing before an IJ.[2] Respondents have detained Petitioner for nearly six months pursuant to 8 U.S.C. § 1226(a). Section 1226(a) provides in relevant part:

> **(a) Arrest, detention, and release**
> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General—
> (1) may continue to detain the arrested alien; and
> (2) may release the alien on—
> (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
> (B) conditional parole; but
> (3) may not provide the alien with work authorization (including an 'employment authorized' endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

8 U.S.C. § 1226(a).

---

[2] Although no party raises the issue, the Court has jurisdiction to consider the issues raised in the petition. While 8 U.S.C. § 1226(e) "bars the court from reviewing the discretionary judgment of an immigration judge and from setting aside a decision regarding detention or revocation or denial of bond or parole," it "does not bar the court from reviewing constitutional challenges through habeas review." *Bah v. Lowe*, 2026 WL 1999150, at *1 (M.D. Pa. July 10, 2026). Accordingly, the Court has jurisdiction to determine whether Petitioner's bond hearing "was constitutionally adequate." *Id.* Nor does Petitioner need to exhaust his administrative remedies prior to filing his habeas petition under these circumstances. *Id.*; *see also Di Zeng v. Lowe*, 2026 WL 2086899, at *2 (M.D. Pa. July 20, 2026) (waiving any exhaustion requirement where "[a]ny appeal to the BIA with respect to denial of bond would delay petitioner's access to the federal courts for several more months"). However, the Court notes that Petitioner does not allege that he ever appealed the IJ's denial of bond to the Board of Immigration Appeals ("BIA"), as he was entitled to. *See* 8 C.F.R. § 236.1(d)(3). After his third denial of bond, Petitioner filed his habeas petition with this Court. The Court will not require Petitioner to file a fourth request for custody redetermination before the IJ or appeal those determinations to the BIA. Rather, to the extent than any exhaustion is required, the Court will excuse any exhaustion requirement.

Noncitizens like Petitioner who are subject to detention under Section 1226(a) may be detained throughout their removal proceedings. *See Borbot v. Warden Hudson Cnty. Corr. Facility*, 906 F.3d 274, 277-79 (3d Cir. 2018). If the Government chooses to detain a noncitizen, the noncitizen is entitled to a bond hearing before an IJ at which he must demonstrate his entitlement to bond by showing that he is neither a flight risk nor a danger to the community. *Id.*

Petitioner was denied bond after IJ Chen concluded he failed to meet his burden to demonstrate he was not a flight risk. His subsequent requests for a bond hearing were denied for failure to show changed circumstances, as his subsequent requests were based on documentary evidence that IJ Chen found should have been provided at his initial bond hearing. *See* 8 C.F.R. § 1003.19(e) ("After an initial bond redetermination, an alien's request for a subsequent bond redetermination shall be made in writing and shall be considered only upon a showing that the alien's circumstances have changed materially since the prior bond redetermination."). Petitioner principal argument is that his detention violates due process because his bond proceedings "did not provide meaningful individualized review of Petitioner's actual circumstances, including his lawful admission, long-pending asylum application, family and community ties, employment history, property ownership, lack of criminal history, and availability of conditions less restrictive than detention." (Doc. 15, ¶ 58).

"A bond hearing must be constitutionally or legally deficient" for the Court to order another bond hearing. *Bah*, 2026 WL 1999150, at *2 (citing *Borbot*, 906 F.3d at 279). "In a fundamentally fair bond hearing, due process has three essential elements." *Ghanem v. Warden Essex Cnty. Corr. Facility*, 2022 WL 574624, at *2 (3d Cir. Feb. 25, 2022) (nonprecedential). In a fundamentally fair bond hearing a noncitizen: "(1) is entitled to factfinding based on a record produced before the decisionmaker and disclosed to him or her; (2) must be allowed to make arguments on his or her own behalf; and (3) has the right to an individualized determination of his interests." *Kamara v. Attorney Gen. of United States*, 420 F.3d 202, 211 (3d Cir. 2005); *accord B.C. v. Attorney Gen. of United States*, 12 F.4th 306, 313 (3d Cir. 2021). The Court will review the transcripts of the bond hearings to determine whether Petitioner's bond hearings complied with due process.

**Transcripts of Bond Hearings**

On March 3, 2026, IJ Chen held a bond hearing. (Doc. 19-1). Petitioner was represented by his former immigration counsel Athena Bu. *Id.* at 1:14-20. Although the IJ indicated that Mandarin is Petitioner's best language, *Id.* at 2:1-6, his counsel twice waived an interpreter, and the IJ never directly asked Petitioner himself if he needed an interpreter. In fact, neither the IJ nor Ms. Bu ever asked Petitioner a single question, including if he wished to testify.

Following the bond hearing, Petitioner obtained new counsel, Ms. Zhou, who was later found ineffective and referred for discipline by IJ Combs for not adequately reviewing

Petitioner's asylum application with the Petitioner prior to the hearing. There is some suggestion that Ms. Zhou may have written Petitioner's asylum application without consulting with him to verify the truthfulness of the statements contained in the application, and that Ms. Zhou merely copied and pasted answers in initial asylum application submitted by Ms. Bu (which IJ Combs also found to be an inadequate asylum application). (Doc. 1-7). As a result, Petitioner's removal proceedings were reopened because Ms. Zhou deprived him of a meaningful opportunity to present his asylum claim through no fault of his own. (Doc. 13-1).

At the March 3 bond hearing, Ms. Bu admitted the charges in the Notice to Appear (with one exception) and declined to designate a country of removal and a Master Hearing was scheduled. *Id.* at 2:19-3:13. Although IJ Chen later realized that Mandarin was Petitioner's best language, Ms. Bu waived an interpreter, without the IJ or counsel asking Petitioner any questions. (Doc. 19-1 at 2-3).

The IJ then proceeded to the bond portion of the hearing:

> The Court: All right, now we're back on the record on the respondent's request for bond. Okay, so, counsel, I have the request with the evidence submitted in support of it. That was on February 25th. I will hear from you.
>
> Ms. Bu: Yes. Respondent has submitted an affirmative asylum application. The case has been pending for almost eight years before his arrest and he has no criminal record. He has real estate properties in the United States. He has family members, his wife and son also in the United States and he has been employed

continuously in the United States and filed taxes accordingly. So our argument is he is not a flight risk and he does not create any danger to the community. We would like to request to have him released without any bond or if a bond is required, we request a reasonable amount.

The Court: Thank you, counsel. Counsel for the Government?

Mr. Campsie: Thank you, Your Honor. The respondent hasn't met his burden as far as showing eligibility for bond. The Department understands that the respondent doesn't have a criminal record, nonetheless, respondent's counsel notes that he's allegedly filed taxes. There's no income taxes at all in the file so it's presumably that he did not file income taxes, and was somehow able to afford property in the State of New York. And other than his property there's very little evidence to show his actual address. So all we have is a house or a piece of property in Orange County and that's essentially it. So respondent already overstayed his visa. So, yes, so all we have is a piece of property, Your Honor. We don't have a sponsor. We don't have a—I see a letter from it looks like Global Services, it's something about quitting the Communist Party.

The Court: Hold on. Hold on. I can't hear you, counsel. . . .

Mr. Campsie: All right, Your Honor, I mean the only thing we have is a letter from the Global Services Center for quitting the Chinese Communist Party. It details his alleged activities in the United States and a deed. So for those reasons the Department would argue that he hasn't shown substantial ties to the United States. And even if the Court finds that he does, that it's not—a high bond would be

necessary. But, you know, just having a deed a letter from a non-profit, it's insufficient to show lack of flight risk, Your Honor.

The Court: Okay. Counsel for the respondent, can you clarify for me what the deed is for? I think that you had indicated he has real estate but it's not clear to me that that's his actual personal address and I'm trying to look through the documents and see if I missed it as to where he's actually living because you've got different addresses. You got one—looks like a printout from Orange County with the address of 574 Route 17M in Middletown, New Jersey but then you've got a deed from a property with a different address. So where does your client live, first of all?

Ms. Bu: Respondent lives in New Jersey because he works in New Jersey in a warehouse as a forklift operator but he owns real estate property in Orange County with the address of 574 Route 17M in Middletown, New York and his wife and son live there and work there in Orange County, New York.

The Court: Wait. His wife and son live in New York but he lives in New Jersey?

Ms. Bu: Yes, correct, because he works in New Jersey.

The Court: And where is proof of his Jersey address in the documents that you submitted?

Ms. Bu: We submit[ted] a letter from USCIS on Page I think 11 of the supporting documents requesting him to submit the annual asylum fee.

The Court: So that's the only proof of his residence is the receipt—I mean the asylum fee notice?

Ms. Bu: We also have like W-2 statements which the family member are trying to locate because he was arrested and they don't live together so they couldn't locate it yet.

The Court: Go ahead, counsel.

Mr. Campise: Your Honor, if I may? This is simply a matter of respondent [sic]. I mean the address is all over the place. We don't have federal income taxes. We have a property deed which we don't know where he lives. We're filling a lot information. There's no statement from the respondent himself to explain what's going on, no statement from the respondent's family members, no identification of the family members as to where they live. This is all just counsel's argument and we're filling in blanks on an application and evidence that is really devoid of any type of—that doesn't answer the question that we have. And so respondent lives in New Jersey, has property in New York, the family lives in New York. We don't know who lives where and what the situation is and without that information, I think that the respondent hasn't met his burden to show that he's not a flight risk.

The Court: Counsel for the respondent, any rebuttal?

Ms. Bu: He—I mean we couldn't show the address doesn't mean he's a flight risk because the only way he can get the relief in the United States for him and his family members is through the asylum. And in the past eight years he's been waiting for his interview. There's no fault on his part. There's really—and also, besides, he

does have a real estate property in the United States and no criminal record whatsoever. There's no reason for him to, you know, just all of the sudden give up everything and not to attend the court hearings.

The Court: Okay.

Mr. Campise: Your Honor, it's simply not meeting the burden. The evidence that's in front of us does not establish where he lives, doesn't show compliance with tax law. We're just grasping at straws at this point, Your Honor.

The Court: Okay. All right, so I appreciate the arguments of the attorneys regarding the respondent's request for bond. Counsel, you noted earlier that you were waiving interpretation. Are you still standing by that or shall I try and get one on the telephone to interpret this part of my decision?

Ms. Bu: We waive interpretation.

The Court: Okay. All right, so the issue is whether the respondent poses a risk of flight. I don't find any evidence that he's a danger to the community. I find that he is not a danger to the community. Counsel argues that the respondent had filed an affirmative I-589 application that has been pending for eight years through no fault of the respondent and that he has established ties to the United States so that he would not be motivated to be a flight risk. Respondent argues that he has a wife and child here in the United States which are derivative beneficiaries of his 589 application. And he also has real estate in the United States. The concern I have though is that it's a respondent's burden to prove that he is not a risk of flight. One of the factors in the Court's consideration or in assessing risk of flight is whether the

respondent has established a stable address and where that address is as well as his connections to family or other community members. In this case the respondent has argued and presented documentary evidence that he owns at least three different properties or at least has connections to three different properties, two in Middletown, New York and another address in Edison, New Jersey. With regard to owning property, there is a deed for an address at 183 Monhagen Avenue in Middletown, New York which is made out with the respondent's name on it. Counsel for the respondent has directed the Court's attention to the notice of action with the respondent's name on it about paying the annual asylum fee that is addressed to the respondent at an address 31 Minebrook Road, Apartment 175B in Edison, New Jersey. That is not the address on the deed. It is also different from the address that the respondent's counsel has submitted on the respondent's behalf indicating that the respondent also has property at 574 Route 17M in Wallkill, New York. So there's three different addresses in this case and I'm troubled by the fact that the respondent apparently lives in New Jersey one separate and apart from his immediate relatives in the form of his wife and his son. That undermines, in the Court's view, arguments that he's got close familial ties. The fact that he has numerous addresses and counsel has proffered that that's because he has bought real estate seems to support the respondent's claim that he's fiscally motivated to remain in the United States because he's invested in property here in the United Staes but the Court does not agree that that is conclusive of whether the respondent would appear for future court proceedings. I'm really troubled by the fact that he's presented three different addresses and has no explanation in the documentary evidence as to why or who lives where. I'm left to speculate, I'm left to assume that the asylum fee was sent to Edison, New Jersey because that's where the respondent is living but I don't have other evidence that that is, in fact, where he's

living. And to the contrary, the only evidence he provided that he owns property is for the two properties in New York. So the problem is—

Ms Bu: Your Honor, I'm sorry. The property is the same property. The property he owns is 574 Route 17M and the 183 Monhagen Avenue address is not a property he owns. It's simply an address on the deed for the buyer.

The Court: Okay, but the printout for the 574 is just a printout. It doesn't have respondent's information on it so I fail to see how that's proof of his residence. I appreciate you pointing that out so I misread the address on the deed so it's just two addresses, right? Because here's the issue.

Ms. Bu: Yes.

The Court: On the deed it says Pengfei Chi residing at 183 Monhagen Avenue, Middletown, New Jersey so you're telling me that I'm misreading that and that doesn't actually mean he's living there. But according to the deed, it does say he's living there. That's not the subject of the property.

Ms. Bu: The subject of the property is on Page 16. The 183 Monhagen Avenue address is the previous address he lived before he purchased the property.

The Court: Okay, so he's purchased the property that in Middletown, New York where he does not live—

Ms. Bu: Correct.

The Court: --where you're proffering his wife and son live?

Ms. Bu: His wife and son live there all the time and he does go back occasionally for the weekend. But because of the work, he needs to get up very early for the work in the warehouse so he lives in New Jersey.

The Court: Okay, okay, so now I got it. All right, so this deed is from the property his wife and son live in in Wallkill, right?

Ms. Bu: Correct, correct.

The Court: Okay, all right.

Mr. Campise: And, Your Honor, I want to interject.

The Court: Go ahead.

Mr. Campise: I mean, again, it's still—all we see is a property. We don't know that his wife and son live there. All we see is a property. One would expect that the wife and the son would write a letter to talk about what the situation is. We don't have statement from him. We don't have a statement from them. And we can't use—I mean attorney statements are not evidence, Your Honor. We can't fill in the blanks with—I mean lots of people own investment properties. As far as we know, he could have tenants there. We have one property—we have an address in Middletown, New Jersey, we have an address in Edison, New Jersey, which was—

The Court: Middletown, New York.

Mr. Campise: Middletown, New York, excuse me. But we have his prior address as being a different address in New Jersey than what was proffered on the correspondence from the USCIS. So for the USCIS it says 34 Middlebrook Road in Edison, New Jersey. On the deed—

The Court: Counsel, I'm sorry. Your paperwork is really interrupting the microphone. I hear your paperwork over DHS.

Ms. Bu: Okay.

Mr. Campise: The deed shows that he's at 185 Monhagen Avenue in Middletown, New York. So, again, there's no driver's license, there's no utility bills, there are not—there's nothing to show, Your Honor, that he resides—where he even lives.

The Court: Where he lives.

Mr. Campsie: Looking at the evidence, I cannot tell where this respondent lives and there's been no proffer of evidence to suggest that other than a property in his name which doesn't necessarily mean that he actually lives there and which counsel has conceded he does not live there. I don't know where the respondent lives.

The Court: Yes.

Mr. Campise: And this evidence—and the Court does not know. So it's impossible for him to show that he's not a flight a risk when we don't even know where the respondent lives.

The Court: Okay, counsel for the respondent, any rebuttal briefly?

Ms. Bu: As I stated earlier, he lives in New Jersey. I mean up until the day he was arrested he lives in New Jersey for work purposes and has real estate property in Orange County, New York where his wife and son live there full-time and then he will go back during weekends to reunite with them. And I mean if the Government thinks—I mean the tricky thing is he does have two addresses. He owns the property in Orange, New York but he lives in New Jersey. And I mean from my point of view I don't see—as I stated earlier, there's no reason for him not to attend the hearing because, you known, we offered the affirmative asylum application and the only way for him to have that status, lawful status in the United States for himself and his whole family is through the asylum application so—

The Court: I understand that argument, counsel, but there are a lot of people who are in that position who still fail to appear so I'm asking for rebuttal from you not to restate anything. My issue is really—if there's anything else you haven't said, you can say it now but I don't need you to rehash it. You proffered that his family lives in the New York address that he lives. You proffered that he works in—stays in New Jersey but he goes back to New York sometimes to see his family, but I don't see the documents to support that claim. And, actually, when I reviewed your legal arguments before, I recall that you stated in his brief that he actually lived in Middletown, New York. I'm trying to re-find that and that may be error on your part but in your brief on hand—paginated 6, Paragraph (i) fixed address and owns real property in Orange County, New York. He has community roots and a home to return to. Family ties, his wife and son reside in Orange County, New York. These close family bonds serve as a powerful anchor to the United States and ensure his

continued presence for all proceedings. What's missing in your own arguments is that he actually lives in New Jersey which is different from what you're saying today because today you switched arguments in saying actually, he's always lived in New Jersey and there's nothing suspicious about it, but in your brief you've all argued that he lives in New York with his wife and son, no mention of an address in New Jersey. And I'm concerned because I also see that the asylum fee notice from USCIS is addressed to the respondent in Edison, New Jersey in 2018. That is different from the deed that you submitted from 2018 and you corrected the Court in its reading of that 2018 deed and saying that the address I mistook for yet another address that the respondent currently has is actually his old address but that doesn't't---

Ms. Bu: That's an address for 2025, not 2018.

The Court: It doesn't explain this big question mark that the respondent's only proof that he lives in New Jersey is a receipt from USCIS—not a receipt—an order that he pay the annual asylum fee. So you keep talking about he lives in New Jersey but then everything else says that he—well, you previously argued he lives in New York. And the issue is I'm confused and when the Court is confused, that means there's doubt and there's questions about the respondent's ties, which state they are in, as to the veracity of his claims of residency. And I agree with the Department. I don't have evidence before me that assures me that the respondent is, in fact, living where you are now arguing he lives, in Edison, New Jersey because you've also presented evidence of New York. And it's not that you've always have to have submissions from family members but I agree with the Department that in this case it's unusual that they're not here given that those are his only proffered ties to the United States in terms of family. And it's also significant because he, according to your arguments today, the respondent doesn't live with his immediate family and that's different from

> the arguments made in the brief that we just submitted last week. So at a minimum I have two addresses, one in New York, one in New Jersey. I'm not satisfied that the respondent has established a stable residence. He's established, from what I can tell without looking at the finances, he's established an acumen for real estate investment. That doesn't give the Court—that doesn't alleviate the Court's concerns regarding risk of flight. So I do find that the respondent has not met his burden of proving that he is not a risk of flight so I'm denying bond. You can certainly appeal that decision to the Board of Immigration Appeals. If you wish to do that, the deadline for the notice of appeal is April 2, 2026. Okay?

*Id.* at 5:14-18:20.

After the IJ Chen denied bond Petitioner requested a second bond hearing before IJ Chen based on changed circumstances. (Doc. 19-2). At the March 17th hearing, Petitioner was provided with a Mandarin interpreter though it again appears that neither IJ Chen nor counsel ever asked Petitioner a single question. IJ Chen found that Petitioner failed to demonstrate changed circumstances warranting a new bond hearing:

> The Court: All right. Now we're on the record on the respondent's request for bond. Counsel, I recall having a hearing already on this case on March 3rd and I saw your submission of a request. To me, it doesn't seem like there are changed circumstances. It seems that you are just submitting evidence that should have been submitted before the last bond hearing.
>
> Ms. Bu: We add the sponsor and also a character reference letter and also the letters—he's also the co-tenants with the respondent and also we submit the

supporting documents related to his employment in the United States and the tax returns.

The Court: So you submitting evidence late does not constitute changed circumstances warranting a new bond hearing counsel. I don't find that you should have another bond hearing. I'm not hearing anything about changed circumstances. I'm hearing oh, after we heard the judge's decision last time, we've now gathered more documents and evidence to rebut that. That's not an appropriate manner to obtain a new bond hearing.

Ms. Bu: Because we couldn't be able to get the supporting documents from the sponsor last time and also, at that time we couldn't secure the sponsor.

The Court: Then you shouldn't have gone forward with making a request for a bond hearing if that's the case. That's not my issue. You asked for the bond hearing. You went forward with it. You failed to meet that burden and now you want to come back and say you want another crack at it. That's not appropriate request for a new bond hearing. I don't find that that's changed circumstances. That's failure to meet your burden and now you want to try and meet it again.

Ms. Bu: Yes, Your Honor, but we request you to please reconsider the circumstances.

The Court: I'm denying that. I'm not reconsidering bond when the respondent already had a full hearing. Through our Mandarin interpreter, sir, I understand from your attorney that you've now gathered more evidence and have obtained a sponsor who's willing to support you. You already had a bond hearing on March 3rd and it

> was your, as it remains, your burden of proof to prove that you are not a flight risk or a danger to the community. I do not find that your subsequent obtaining of additional evidence constitutes a changed circumstances warranting a new bond hearing and that the proper manner to disagree with the Court's ruling on March 3rd denying the request for bond is to file an appeal with the Board of Immigration Appeals. All right, so that concludes the hearing today.

*Id.* at 3:13-5:9.

On May 12, 2026, Petitioner's request for a custody redetermination filed by Ms. Zhou was again denied because "[n]ew evidence that could have been filed previously is not a change in circumstances." (Doc. 1-6).

**Petitioner's Bond Hearings Were Not Fundamentally Fair**

It is undisputed that noncitizens like Petitioner are entitled to the protections of the Fifth Amendment's Due Process Clause. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("But once an alien enters the country, the legal circumstances change, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *see also Reno v. Flores*, 507 U.S. 292, 306 (1993) ("[T]he Fifth Amendment entitles aliens to due process of law in deportation proceedings."). In a bond hearing, a noncitizen must receive "a full and fair hearing that allows them a reasonable opportunity to present evidence on their behalf." *Abdulraham v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003).

To satisfy due process, in a fundamentally fair bond hearing a noncitizen: "(1) is entitled to factfinding based on a record produced before the decisionmaker and disclosed to him or her; (2) must be allowed to make arguments on his or her own behalf; and (3) has the right to an individualized determination of his interests." *Kamara*, 420 F.3d at 211. To succeed, Petitioner must also that "substantial prejudice resulted" from the due process violation. *Serrano-Alberto v. Att'y Gen.*, 859 F.3d 203, 213 (3d Cir. 2017) (a "procedural due process violation" occurs if a petitioner is "not afforded the opportunity to argue on his own behalf" because (1) he was prevented from reasonably presenting his case, and (2) ... substantial prejudice resulted"). Due process also entitles a noncitizen to effective assistance of counsel. *See Calderon-Rosas v. Attorney Gen.*, 957 F.3d 379, 384-85 (3d Cir. 2020) ("It is by now beyond question that the Due Process Clause guarantees [noncitizens] the right to effective assistance of counsel in removal proceedings.").

Because Petitioner has demonstrated that he was not "allowed to make arguments" on his own behalf at the bond hearings because the IJ never asked him whether he needed a Mandarin interpreter, which prevented the IJ from making an individualized determination as to his flight risk and rendering his initial bond hearing fundamentally unfair, the Court will grant the petition and order new bond hearing to be held by the Court, not the IJ.[3]

---

[3] In prior immigration habeas proceedings, the Government has acknowledged that the Court may conduct the bond hearing itself. *J.G.J. v. Sage*, 2026 WL 915576, at *11 n.19 (M.D. Pa. Apr. 3, 2026). Moreover, Courts in this Circuit have conducted bond hearings in similar circumstances, particularly where delays risk perpetuation of the constitutional injury. *See, e.g., Lin v. Lower*, 2026 WL 1746582, at *6 (M.D. Pa. June 17, 2026) (Mehalchick, J.) ("Considering the risk of further injury with delays and continued detention, the Cout will conduct Lin's individualized bond hearing."); *Centeno-Martinez v. Jamison*, 2025 WL

Moreover, the IJ compounded her initial error by twice denying the Petitioner, through new counsel, the opportunity to demonstrate "changed circumstances" warranting a custody redetermination thus denying Petitioner the opportunity to make arguments on his own behalf. In fact, there is nothing in the record to suggest that IJ Chen or Ms. Bu ever asked Petitioner a single question during his initial and second bond hearing. And the record does not indicate that Ms. Zhou (who was found ineffective) ever asked Petitioner a single question during the third hearing.

"It is well-established that the provision of an interpreter is a 'minimum' requirement of a fair hearing for asylum applicants who have limited English proficiency; otherwise, an applicant's 'procedural rights would be meaningless in case where the judge and ... applicant cannot understand each other.'" *B.C.*, 12 F.4th at 314 (quoting *Marincas v. Lewis*, 92 F.3d 195, 204 (3d Cir. 1996). In *B.C.* the Court of Appeals for the Third Circuit held "that due process requires IJ's to determine whether a noncitizen has a sufficient level of proficiency in 'Standard' English to proceed without an interpreter." *Id.* "This may begin by giving noncitizens a meaningfully chance to express, on their owns terms at the outset of a hearing, the language in which they are sufficiently proficient." *Id*

3157711, at *3 (E.D. Pa. Nov. 12, 2025) (Sanchez, J.); *Chiguano v. Lowe*, 2025 WL 3187161, at *4 (M.D. Pa. Nov. 14, 2025) (Wilson, J.) ("Federal district courts have the authority to enforce writs of habeas corpus and to conduct bond proceedings in habeas corpus cases brought by immigration detainees.") (citing *Sylvain v. U.S. Att'y Gen.*, 714 F.3d 150, 155 (3d Cir. 2013)).

The Court cannot say that Petitioner had the opportunity to present evidence and make arguments on his own behalf. The IJ never determined whether Petitioner had a sufficient level of proficiency in English, and his counsel twice waived a Mandarin interpreter without the IJ ever inquiring as to Petitioner's understanding of the English language. *See Id.* (holding that "due process requires IJs to determine whether a noncitizen has a sufficient level of proficiency in 'Standard' English to proceed without an interpreter"). Moreover, the IJ never once asked Petitioner if he wished to testify on his own behalf. And nothing in the transcripts suggest that Ms. Bu or Ms. Zhou ever asked Petitioner to testify on his own behalf. Under these circumstances, the Court finds that Petitioner's bond hearings were fundamentally unfair.[4] *See B.C.*, 12 F.4th at 313 (in a removal proceeding where the IJ "did not take adequate steps to evaluate whether" petitioner "needed an interpreter" the "second pillar" of a fair hearing was not satisfied). There is "an unacceptably high risk of erroneously depriving a noncitizen of his liberty when an IJ does not properly assess whether he needs an interpreter." *Id.* at 315. And while due process is "flexible," the noncitizen must have "the opportunity to communicate his language proficiency on his own terms." *Id.* at

---

4 At the March 17, 2026, bond hearing, where IJ Chen found Petitioner failed to demonstrate "changed circumstances," she provided Petitioner with a Mandarin interpreter without first asking Ms. Bu whether she would waive interpretation on Petitioner's behalf. (Doc. 19-2 at 2:21:24 ("The Court: Okay. And I have our Mandarin interpreter? Madam interpreter, would you please state your name for the record."); *Id.* at 3:6-11 ("The Court: All right. So through our Mandarin interpreter, sir, I am resetting your removal hearing for March 31 at 9 a.m. That'll give you time to submit additional evidence to support your application for asylum and related relief from removal."). The record reflects that IJ Chen never asked Petitioner directly about his understanding of the English language.

316. But that is not what happened here, as the IJ never asked Petitioner a single question and did not inquire with him directly, at the outset of hearing or any time after, of his proficiency in English. "Failure to provide an interpreter when needed makes meaningless a noncitizen's right to due process." *Id.* "And not making a threshold inquiry into whether an interpreter is needed, in turn, renders the right to an interpreter meaningless." *Id.* That's what happened here.

Petitioner has also shown prejudice. Nothing in record suggests Petitioner understands English, and although the IJ was aware that Mandarin is his primary language, she never asked Petitioner himself whether he speaks or understands English sufficient to understand her statements and the statements of his counsel and counsel for DHS. Moreover, Petitioner's counsel twice waived interpretation and his later counsel was found ineffective by IJ Combs. The record reflects that neither IJ Chen nor counsel ever asked Petitioner a single question during the initial bond hearings. Two weeks later IJ Chen denied Petitioner's request for bond for failure to demonstrate "changed circumstances." IJ Chen reasoned that the sponsor and character letters, tax records, and documents clarifying his primary address, among others, did not amount to changed circumstances warranting reconsideration of her finding that Petitioner failed to meet its burden to prove he was not a flight risk because the evidence could have been presented at the initial bond hearing. And Petitioner was denied the opportunity to present this new evidence a third time, two months later. Although Petitioner's counsel informed IJ Chen that

the tax records and other documents she wished to submit were previously unavailable because she was unable to obtain them while Petitioner was in custody, IJ Chen continued to refuse to receive or review these new documents. Thus, with many months to years of a potential deprivation of liberty at stake, IJ Chen refused to consider this evidence because she reasoned that these documents should have been provided two weeks earlier at the initial bond hearing and Petitioner failed to demonstrate "changed circumstances." The IJ did not address counsel's arguments that new evidence was unavailable because Petitioner was in custody and could not timely obtain it, and she attributed counsel's failure to be prepared at the time of the initial bond hearing into what Petitioner refers to a "circular" process: the IJ continues to deny him the ability to present or clarify evidence that he not a flight risk because his former counsel could have presented such evidence earlier. Under these circumstances, IJ Chen's refusal to consider new evidence was arbitrary and fundamentally unfair.[5] *See Saravia v. Att'y Gen*, 905 F.3d 729, 738 (3d Cir. 2018) (initial bond hearing was fundamentally unfair and the IJ should have given petitioner the opportunity to provide that "evidence or explain its unavailability").

---

5 The Court would not be the first to conclude a bond hearing held by IJ Chen was fundamentally unfair. *See Alonzo v. Francis*, 2026 WL 1492819, at *2 (D.N.J. May 28, 2026) (bond hearing held by Judge Chen was unfair when "Judge Chen refused to consider the documents Petitioner submitted in support of his bond application" because they were submitted "too late" and the respondents "point to no immigration court rule or prior order that would make Petitioner's submission late.") (Wigenton, J); *see also Altamirano v. Cabezas*, 2026 WL 867135, at *3-4 (D.N.J. Mar. 25, 2026) ("It is clear that no actual bond hearing occurred here and that the proceeding before Judge Chen was fundamentally unfair. . . . It is hard to imagine a person who is less likely to flee or pose a danger to others. And it hard to fathom a more flagrant disregard of due process rights by those sworn to uphold constitutional principles.") (Cox Arleo, J.).

IJ Chen's failure to inquire with Petitioner at all, including his need for an interpreter, had a high potential to affect the outcome the bond hearings. *See Serrano-Alberto*, 859 F.3d at 213 ("a petitioner establishes a due process claim by showing that the infraction has the *potential* to affect the outcome") (emphasis in original). For example, IJ Chen relied on her fundamental misunderstanding of Petitioner's individualized circumstances by referring to Petitioner as "having an acumen for real estate" in concluding he was a flight risk, while not fully comprehending that Petitioner owns just a single property in New York where his wife and son live and rents an apartment in New Jersey as his primary address because it is closer to work and he needs to wake up early for his work as forklift driver. *See B.C.*, 12 F.4th at 318 ("the failure evaluate B.C.'s need for an interpreter resulted in confusion and misunderstanding" during the hearing); *see also Id.* ("[T]he linguistic and cultural differences endemic in immigration hearings may frequently result in statements that appear to be to be inconsistent or unnatural, but in reality arise from a lack of proficiency in English or cultural differences rather than attempts to deceive."). And IJ Chen refused to consider new material evidence supporting Petitioner's claim of "changed circumstances." Although his counsel twice waived an interpreter, Petitioner should not suffer the consequence of his counsel's waiver when IJ Chen never in the first instance questioned Petitioner on the record about his understanding of the English language or asked any questions directly to Petitioner when the circumstances regarding his stable residence were sharply questioned by the IJ (who incorrectly noted that Petitioner had three addresses, while chastising Ms.

Bu). In fact, the record shows that IJ Chen never once asked a single question to Petitioner. Accordingly, based on the totality on the circumstances, the Court will grant the petition in part and order a new bond hearing because Petitioner's bond hearings were fundamentally unfair, and he was prevented from making arguments on his own behalf which had the potential to affect the outcome of the bond hearings.[6] The new bond hearing will be held by Court, not an IJ, and Petitioner will have the burden to establish that he is not a flight risk or a danger to the community. 8 U.S.C. § 1226(a).

Petitioner's request for fees and costs under the Equal Access to Justice Act will be held in abeyance pending the receipt of a fee petition. *Michelin v. Warden Moshannon Valey Corr. Cent.*, 169 F.4th 418 (3d Cir. 2026) (allowing fees under EAJA in immigration habeas proceedings under 28 U.S.C. § 2241).

## IV. CONCLUSION

For the foregoing reasons, Petitioner's habeas petition will be granted in part. A separate Order follows.

Robert D. Mariani
United States District Judge

[6] The Court also notes that there is not one scintilla of evidence in the record supporting a conclusion that Petitioner is a flight risk. The fact that Petitioner owns a home in Orange County, New York, where his wife and son reside, and also rents an apartment in Edison, New Jersey so he can commute to work, does not establish a risk of flight. While this Court lacks jurisdiction under 8 U.S.C. § 1226(e) to review the discretionary determinations of the IJ, the unique circumstances of this case as set forth in this memorandum opinion nevertheless lead it to conclude that Petitioner's bond hearings were fundamentally unfair.